Filed 2/14/22  P. v. Ramos-Coreas CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LUIS ALBERTO RAMOS-COREAS,<br><br>        Defendant and Appellant. | A156276<br><br>(San Mateo County<br>Super. Ct. No. 16NF013767) |

A jury acquitted defendant Luis Alberto Ramos-Coreas[1] of attempted murder but found him guilty of assault on a peace officer, resisting a peace officer with serious bodily injury, and battery with serious bodily injury.  The jury also found true several related enhancement allegations.  After admitting to a prior conviction, defendant was sentenced to an aggregate term of 18 years in state prison.  He contends on appeal that the trial court erred in failing to instruct the jury that mental impairment was a defense to assault on a peace officer and to resisting a peace officer with serious bodily injury.  He also asserts that the court gave conflicting instructions on the knowledge element of these two offenses.  We affirm.

---

[1] We note that the abstract of judgment lists defendant's name as "Alberto Ramos," but in his trial testimony, defendant stated his name is "Luis Alberto Ramos-Coreas."

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

In September 2017, defendant was charged by amended information with attempted murder (Pen. Code,[2] §§ 664/187, subd. (a); count 1), assault on a peace officer (§ 245, subd. (c); count 2), resisting a peace officer with serious bodily injury (§ 148.10, subd. (a); count 3), and battery with serious bodily injury (§ 243, subd. (d); count 4). The charges included enhancement allegations for personal infliction of great bodily injury (§ 12022.7, subds. (a), (b)) and use of a deadly weapon (§ 12022, subd. (b)(1)). The amended information further alleged that defendant had suffered a prior conviction which qualified as a serious felony (§ 667, subd. (a)(1)), a prior strike (§§ 667, subd. (d), 1170.12, subd. (b)), and a prison prior (§ 667.5, subd. (b)). Defendant entered a plea of not guilty by reason of insanity.

### A. The Prosecution Case.

On the afternoon of November 24, 2016, Thanksgiving Day, a store supervisor at a South San Francisco Starbucks observed defendant walking back and forth inside the store. She asked him if he needed help, but he did not respond. He sat down with a skateboard by his leg, moving his head and talking to himself. She could not understand what he was saying. After a few minutes he walked outside where customers were sitting in a patio adjacent to the sidewalk. A customer noticed that defendant was holding his skateboard and appeared to be very angry. He was cursing loudly and saying that he was " 'going to get someone' " and was " 'gonna kill someone.' "

South San Francisco Police Officer Robby Chon had just finished issuing a citation to a driver when the Starbucks supervisor approached him and said that a man was causing a disturbance. Officer Chon was on motorcycle duty and was wearing a full uniform. He contacted defendant,

_____

[2] All undesignated statutory references are to the Penal Code.

2

who was holding the skateboard. The officer explained that the business wanted him to leave. He asked defendant if he had a home and defendant answered, " 'I'm a homie.' " The officer then asked "very politely" whether defendant had a place to eat, and told him he could find him a place for Thanksgiving dinner.

When Officer Chon asked defendant for his identification, defendant became uncooperative. His behavior suggested he was under the influence of alcohol or drugs. Defendant screamed his name loudly, becoming more agitated and aggressive as Officer Chon continued to question him. He refused the officer's order to put down the skateboard and ran away.[3] Officer Chon caught up to defendant in the middle of the street and pulled out his taser.

Officer Phillip Nielsen arrived in a police vehicle with lights and sirens in response to Officer Chon's call for backup. He saw Officer Chon and defendant standing in the middle lane of traffic facing each other. When Officer Chon ordered defendant to drop the skateboard, he put it down, mounted it, and rode off. Officer Nielsen drove in front of defendant and turned his car to block defendant's path. Defendant hit the side of the car but did not fall down. Officer Chon was chasing defendant from behind.

Defendant picked up his skateboard and took a few running steps. When Officer Chon caught up to him, defendant turned and swung the skateboard, hitting the officer in his head. A bystander heard defendant say, " 'Take this, motherfucker.' " Officer Chon immediately fell to the ground and

---

[3] Officer Chon testified that he suffered memory loss as a result of his injuries and could not recall what happened after this point. His next memory was waking up in the hospital.

3

defendant ran away. The bystander approached and saw that the officer was not moving and a pool of blood was forming under his head.

Officer Nielsen did not see Officer Chon fall. He exited his car and chased defendant on foot, ordering him to stop. Defendant dropped his backpack and removed his shirt as he was running. He then stopped and turned toward the officer, assuming a fighting stance. Officer Nielsen pulled out his taser and told him to get down on the ground, but defendant took off again. Eventually defendant was tackled by other officers.[4] When he was asked if he needed medical attention, he yelled out, " 'I'm bipolar.' "

Dr. Stephen Magill treated Officer Chon at the hospital. He testified that Officer Chon sustained multiple skull fractures to the bones near his temple, his eye socket, and the base of his skull. The injuries indicated that he had been hit with very hard force, similar to having been hit by a baseball bat swung as hard as possible. Officer Chon also had soft tissue injuries. His brain was bruised and he developed an epidural hematoma. Within 40 minutes of arriving at the hospital, he was becoming comatose and was near death. Surgery was done to remove the blood clot and stop the bleeding in the brain. The surgery took two hours, and the officer was in a medically induced coma for three days afterwards.

At trial, which occurred about two years after the incident, Officer Chon was still suffering from vision problems and pain. He understood that he would never be cleared for regular duty.

## B.    The Defense Case.

Defendant was 30 years old at the time of trial. He testified that he was born in Redwood City and raised in South San Francisco. He had a

_____

[4] An 18-minute montage of surveillance video and cell phone video of the incident was played for the jury.

4

normal childhood and graduated from high school. However, in his junior year in high school he was hospitalized after experiencing psychotic thoughts regarding God and angels. He was prescribed Zyprexa, but the medication made him feel lethargic. At some point he tried to overdose on Zyprexa and was prescribed lithium instead. As long as he was taking his medication as prescribed, he was stable.

When defendant went off of his medication, he would experience severe anxiety and have manic thoughts. His energy level would increase, he would have trouble sleeping, and his thoughts would become illogical or irrational. His condition would progressively worsen, leading to depression or a psychotic episode. At that point, he would be unable to make rational decisions or recognize that he was psychotic or depressed. He had been placed on several Welfare and Institutions Code section 5150 and 5250 involuntary holds. By the time he was 21, he had been hospitalized five times and was receiving Supplemental Security Income disability payments. Over time, he had been prescribed several different medications, and when he took them he was able to maintain a relatively normal lifestyle. His thinking would be normal and he could make decisions for himself.

Defendant stopped taking his medication about three days before Thanksgiving 2016, after he fell asleep and missed his dose. When it was time for his next dose, he did not take it. He believed that the medication contained metal that interfered with his ability to receive messages through his phone, music, and radio. The day before Thanksgiving, he and his friends were detained and searched by members of a gang task force. That night he went to a church service and intentionally left his belongings on a bench, including his phone, his wallet with his driver's license, and some change.

5

On Thanksgiving morning, defendant woke up before dawn feeling very energetic. He put a boom box in his backpack and left the house on his skateboard, which was his primary mode of transportation. A police officer stopped him at around 3:00 a.m. and told him that he matched the description of a robbery suspect. The officer asked his name and let him go after searching him and taking his photograph.

Defendant continued skateboarding and eventually stopped across the street from a house belonging to a female acquaintance. By then it was about 6:00 a.m. He put the boom box down, turned the music up, and started to dance in the middle of the street. Two police officers contacted him and asked him what he was doing. He left when they told him he was not being detained. He then walked to a church where he got on his knees and cried and prayed to the Virgin Mary. Later he went to a park where he asked to join a pickup basketball game. He only played one game because he kept giving the ball purposefully to the other team.

After playing basketball, he went to the Starbucks to use the restroom. He sat down and stayed for a while, talking to himself. He went outside and started dancing and singing in the patio area and on the sidewalk while playing his boom box. At some point, he became upset and started swearing when he recalled a news story about gang members being told that it was okay to attack and rob old women. He was swearing and singing while looking at his reflection in the glass windows of the Starbucks and unoccupied parked cars. He was not acting aggressively towards any of the people who were nearby.

Officer Chon contacted defendant in front of the Starbucks as he was dancing on the sidewalk. The officer asked for his identification and defendant screamed out his name. He was not afraid of Officer Chon or

6

afraid of being arrested. He fled when Officer Chon put his hand on defendant's left arm and told him he needed to step to the side. Defendant ran to the middle of the street. Officer Chon told him to stop and put down the skateboard, but defendant continued to hold the skateboard and dance. When the police car arrived, defendant put down the skateboard and rode away from the officers. The police car drove past and made a sharp left turn in front of him. Defendant hit the driver's side of the vehicle and fell.

Defendant sensed that someone was chasing him, but testified that he did not know who it was. He heard footsteps coming behind him on his right, and he swung the skateboard to get the person to back off so that he could flee. He did not intend to hit, injure, or kill the person. He testified that before he swung the skateboard he "sort of felt like there was like a presence of—because I had seen the movie Ghost, which is some movie from my childhood. I felt like there was some type of—in the movie, there is some type of feelers that take the person when they die. They take them under, I guess you would say." He did not look behind to see who was chasing him and did not realize it was Officer Chon, nor did he think that the person probably was a police officer. He denied saying, " 'Take that, motherfucker,' " when he swung the skateboard.

On cross-examination, defendant admitted he knew Officer Chon was a police officer when he decided to run away from him. He acknowledged that he had faced Officer Chon in the middle of the street with his skateboard in his hand. The officer told him to drop his skateboard, but he did not want to comply. His plan was to continue running away. He took off when the police car arrived because he did not want to be arrested for resisting a police officer.

Defendant also admitted that by the time the police car arrived he knew the officers were trying to detain him and that he needed to stop them or slow them down so that he could get away. The prosecutor asked: "And so at that moment, . . . you decided that you were going to stop Officer Chon. Isn't that right?" Defendant responded: "I was going to try to stop him, yes." He denied wanting to hit the officer, claiming he only wanted the officer to step back so that he could continue to flee. Afterwards, he realized that he had hit someone or something but he did not look back. He admitted he probably discarded his backpack and clothing because he wanted to escape. He acknowledged that during his interaction with Officer Chon he knew he was a police officer.

On redirect, defendant testified that he did not realize someone was chasing him when the police car passed him and cut him off. He thought the officer was trying to hit him with the car. He reiterated that when he swung the skateboard he did not have the intent to hit anyone and did not know that it was Officer Chon who was behind him. He was unaware that he had injured the officer until he read the charges after his arrest.

## C. The Prosecution's Rebuttal.

Forensic psychologist Dr. Jeremy Coles was originally appointed by the trial court to do an insanity evaluation of defendant. At trial he testified as an expert witness for the prosecution.

Dr. Coles diagnosed defendant as suffering from bipolar I disorder, which is characterized by severe mood fluctuations that have resulted in hospitalizations. Dr. Coles explained that skipping one dose of bipolar medication does not usually cause any issues. If a person stops taking medication altogether, there will typically be a decline in functioning and mood resulting in a depressed mood or a manic state. But it is highly

unlikely that defendant could have experienced any delusions only 12 hours after a missed dose.

Defendant was on his medications when Dr. Coles interviewed him in jail, in April 2018. He was psychologically intact and was able to follow instructions. He did not appear significantly depressed or manic. He told Dr. Coles that he decided to run away when a police officer asked him to step to the side because he felt that he had been harassed enough by the police. Defendant did not want to discuss the event that led to the charges. He did not mention anything about black figures, and acknowledged that he knew the person who contacted him outside Starbucks was a police officer. Defendant did describe going to an anti-Trump protest in the days before the incident where he grabbed the microphone and talked too long or said something that he shouldn't have said. He said he made a fool of himself and ended up dipping his head in a fountain.

Dr. Coles opined that at the time of the offense, defendant's mental status was "essentially intact, although he was experiencing some turmoil." Defendant was not distracted by severe symptoms of a mental illness. His actions were conscious and deliberative, and he knew he was fleeing from the police when he ran. His emotional turmoil was most likely the result of being off his medications. Persons with bipolar disorder can display higher levels of impulsivity, poor judgment, and a lack of frustration tolerance. Nevertheless, Dr. Coles opined that defendant was able to distinguish good decisions from bad decisions.

## D.    Closing Arguments and Jury Instructions.

The jury was instructed on the mental impairment defense under CALCRIM No. 3428. As given, the instruction stated: "You have heard evidence that the defendant may have suffered from a mental disease,

9

disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the crime charged in count 1, PC 644/187, the defendant acted with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically: the intent to kill. If the People have not met this burden, you must find the defendant not guilty of PC 644/187, Count 1."

During closing argument, the prosecutor told the jury that the mental impairment defense was only relevant to the attempted murder charge, and only as to the issue of whether any impairment interfered with or precluded defendant from forming the intent to kill. Defense counsel concurred with the prosecutor that evidence of defendant's mental illness could be considered only for the limited purpose of deciding whether he had acted with the intent to commit murder.

## E. Verdicts and Sentencing.

On November 30, 2018, the jury found defendant not guilty of attempted murder. The jury found defendant guilty of the remaining three counts, and found all the associated enhancement allegations to be true. Defendant withdrew his plea of not guilty by reason of insanity and admitted the prior conviction allegations.

At the sentencing hearing, the trial court denied defendant's motion under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 to dismiss the strike allegation. He was sentenced to an aggregate term of 18 years, comprised of the midterm of four years on count 2, doubled to eight years due to the prior strike conviction, with a consecutive five-year term for the prior conviction, and an additional consecutive five-year term for inflicting great bodily injury. Pursuant to section 654, the court imposed and stayed

sentencing on counts 3 and 4.  The court also struck the penalty for the prior prison term.  Various fines and fees were also imposed.  Defendant received 900 days of sentencing credits.  This appeal followed.

## II.  DISCUSSION

**A.  Failure to Instruct that Mental Impairment Was a Defense to Counts 2 and 3.**

### i.  Contentions on Appeal

Defendant contends that the trial court erred in failing to instruct that his mental impairment was a defense to the charges of assault on a peace officer and resisting arrest with serious bodily injury, counts 2 and 3, respectively.  He also asserts the court erred in expressly limiting this defense to the charge of attempted murder.  He argues that the defense was relevant to counts 2 and 3 because both charges "required the state to prove beyond a reasonable doubt that [defendant] had actual or constructive knowledge that Officer Chon was a police officer, and not a phantom feeler."  He also maintains that the court was obligated to "instruct fully and completely" on the defense once it elected to instruct on the defense as to the attempted murder charge.

### ii.  The Claim Is Not Forfeited

The Attorney General initially contends that defendant's claim is forfeited on appeal because he did not ask for the jury to be instructed on mental impairment as a defense to the assault or resisting charges.  We disagree.

Although defense counsel acquiesced to giving CALCRIM No. 3428 as a defense to attempted murder only, defendant's arguments on appeal are not forfeited under the doctrine of invited error.  The doctrine of invited error holds that a "defendant may not be entitled to challenge a requested instruction where the record clearly reflects that counsel had *a deliberate*

11

*tactical purpose* in requesting it." (*People v. Hernandez* (1988) 47 Cal.3d 315, 353, italics added.) However, "[w]e may review the validity of an instruction initially requested by the defense where counsel's actions in seeking or not objecting to the instruction constitutes *simply neglect or mistake*. [Citations.] The trial court does have a duty to correctly instruct the jury on principles of law relevant to issues raised by the evidence in a criminal case." (*Ibid.*, italics added; see also *People v. Moon* (2005) 37 Cal.4th 1, 28 ["The invited error doctrine will not preclude appellate review if the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction."].) Here, the record does not suggest any deliberate tactical purpose for defense counsel's agreement to omit counts 2 and 3 from the mental impairment instruction. Accordingly, we independently review the trial court's instruction for legal error. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

### iii.    *The Mental Impairment Instruction Was Proper*

The trial court's version of CALCRIM No. 3428 was not erroneous. Even before section 25 abolished the defense of diminished capacity, mental impairment was not a defense to a general intent crime. (See *People v. Drew* (1978) 22 Cal.3d 333, 344; see also *People v. Gutierrez* (1986) 180 Cal.App.3d 1076, 1082–1083 [discussing the reasons for the rule precluding evidence of mental illness as a defense to a general intent crime, or for use in a mistake-of-fact defense].) "The diminished capacity defense, which addressed an accused's 'general capacity or ability to form a specific intent or harbor a mental element of an offense,' was abolished in 1982." (*People v. Reyes* (1997) 52 Cal.App.4th 975, 982, fn. omitted (*Reyes*); § 25, subds. (a), (b).) Consequently, evidence of a defendant's mental disorder "may no longer be used as an affirmative defense to a crime," and such evidence is admissible

12

"solely to negate an element of the crime which must be proven by the prosecution." (*Reyes*, at p. 982; § 25, subd. (a).)[5]

Defendant concedes that the offenses alleged in counts 2 and 3 are general intent crimes. However, relying primarily on *Reyes*, he argues that a jury may consider mental impairment when a defendant is charged with a crime that contains a "knowledge element," even if the crime is a general intent offense. He asserts that counts 2 and 3 "contain knowledge elements," and claims that evidence of his mental impairment was therefore relevant to the jury's decisions on these counts. We are not persuaded.

In *Reyes*, the appellate court held that for the crime of receiving stolen property the jury could consider evidence of the defendant's voluntary intoxication and mental disorders in deciding whether he knew that the subject property was stolen, notwithstanding classification of the crime as one of general intent. (*Reyes*, *supra*, 52 Cal.App.4th at pp. 984–986.) Defendant here argues that, like the offense of receiving stolen property, the crimes of assault on a peace officer and resisting arrest with serious bodily injury include a "knowledge element." Specifically, he contends that the jury must find that the defendant knew that the person he or she was assaulting, or resisting, was a peace officer.

We first observe that the holding of *Reyes* has been criticized as having been based on outdated and inapplicable authority. (See *People v. Berg*

_____

[5] Section 25, subdivision (a) provides: "The defense of diminished capacity is hereby abolished. In a criminal action, as well as any juvenile court proceeding, evidence concerning an accused person's intoxication, trauma, mental illness, disease, or defect shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged."

(2018) 23 Cal.App.5th 959, 969.) In any event, *Reyes* is easily distinguishable here.

The crime of receiving stolen property requires the prosecution to prove that the defendant had *actual knowledge* that the property was stolen: " '[P]roof of the crime of receiving stolen property requires establishing that the property in question was stolen, that the defendant was in possession of it, *and that the defendant knew the property to be stolen*.' "[6] (*Reyes, supra,* 52 Cal.App.4th at p. 984, italics added.)

In contrast, the crimes of assault on a peace officer and resisting arrest with serious bodily injury can be committed without actual knowledge that a peace officer was the target of the assault or resistance, provided that such knowledge can be attributed to the defendant under a reasonable person standard. Section 245, subdivision (c) provides, in relevant part: "Any person who commits an assault . . . upon the person of a peace officer . . . , and who knows *or reasonably should know that the victim is a peace officer* . . . engaged in the performance of his or her duties, . . . shall be punished by imprisonment in the state prison for three, four, or five years." (Italics added.) Similarly, under section 148.10, subdivision (b)(3), the crime of resisting arrest with serious bodily injury requires the trier of fact to find "[t]hat the person who willfully resisted any peace officer knew *or reasonably should have known that the other person was a peace officer* engaged in the performance of his or her duties." (Italics added.) Thus, even if mental impairment could negate a defendant's actual knowledge of the victim's

---

[6] Section 496, subdivision (a) provides in relevant part: "Every person who buys or receives any property that has been stolen, . . . *knowing the property to be so stolen* . . . , shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170." (Italics added.)

identity, such impairment cannot negate the alternate element that the defendant reasonably should have known the victim was a peace officer.

*People v. Mackreth* (2020) 58 Cal.App.5th 317 (*Mackreth*) is instructive. In that case, the defendant was charged with resisting arrest under section 148, subdivision (a)(1). A defendant commits that offense when he or she "willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . ." (§ 148, subd. (a)(1).) The defendant in *Mackreth* argued that the statute's use of the word "willfully" necessitated the conclusion that " 'actual knowledge' " was required. (*Mackreth*, at p. 329.) He further asserted that the jury should have been permitted to consider his " 'mental breakdown' " and " 'bipolar disorder' " in deciding whether his " 'reasoning ability' " was so deficient that he could not have perceived that the persons who were trying to detain him were police officers. (*Id.* at p. 335.)

Applying principles of statutory construction, the appellate court held that section 148, subdivision (a)(1) does not require actual knowledge as to the status of the victim. (*Mackreth*, *supra*, 58 Cal.App.5th at p. 334.) The court further held that "evidence of [a] defendant's mental disorder [is] irrelevant and inadmissible to show that he [or she] lacked the ability to or did not actually perceive that the officers were peace officers. 'The common law does not take account of a person's mental capacity when determining whether he [or she] has acted *as the reasonable person would have acted.* The law holds "the mentally deranged or insane defendant accountable for his negligence as if the person were a normal, prudent person." ' " (*Id.* at p. 335.)

Here, the jury was correctly instructed that to convict defendant of assault on a peace officer it had to find that, "When the defendant acted, he

15

knew, or reasonably should have known, that the person assaulted was a peace officer who was performing his duties." Similarly, the court instructed the jury that to convict defendant of resisting a peace officer with injury it must find that, "When the defendant acted, he knew, or reasonably should have known, that Robby Chon was a peace officer performing or attempting to perform his duties." Because the reasonable person standard can be applied to a defendant's knowledge of the victim's status, we reject defendant's contention that the trial court erred in failing to instruct the jury that it could consider his mental impairment as to the charges in counts 2 and 3.

### iv. *Any Error Was Not Prejudicial*

Even if the trial court erred in restricting the jury's consideration of defendant's mental impairment to count 1, it would be state law error, requiring reversal only if there was a reasonable probability the error affected the verdict adversely to defendant.[7] (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134–1135.) We see no such probability here.

As to counts 2 and 3, there was ample evidence that a reasonable person would have known Officer Chon was a peace officer engaged in the performance of his duties when the offenses were committed. "By definition,

---

[7] See *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). Under *Watson*, we assess whether it is "reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*Id.* at p. 836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

a reasonable person is not one who hears voices due to severe mental illness. In blunt fashion, our Supreme Court long ago defined a reasonable person as a 'normal person.' [Citation.] The reasonable person is an abstract individual of ordinary mental and physical capacity who is as prudent and careful as any situation would require him [or her] to be." (*People v. Jefferson* (2004) 119 Cal.App.4th 508, 519.)

Even if defendant did not subjectively believe that the person he hit with his skateboard was a peace officer, a reasonable person would have known that he or she was being pursued by an officer when the offense was committed. We note that defendant himself testified that he knew Officer Chon was a police officer when he decided to run away from him. Officer Chon was in full uniform and had spoken with him for several minutes. When defendant initially fled the Starbucks, Officer Chon chased him on foot, facing him down in the middle of the street with his taser. There was no evidence that anyone other than a police officer was pursuing defendant. And while the jury did acquit defendant of attempted murder after hearing the mental impairment instruction, we disagree with his contention that this was a close case with respect to the other charged offenses. The jury's task in deciding counts 2 and 3 was distinct from the issues in count 1. As to attempted murder, the jury was instructed to consider defendant's mental condition only with respect to his ability to form the intent to kill, not to whether he knew the victim was a police officer.

In his reply brief, defendant contends that nothing in the record shows that the jury considered the constructive knowledge theory. However, the jury was properly instructed on the "should have known" standard, and we must presume the jury followed the trial court's instructions. (See, e.g., *People v. Buenrostro* (2018) 6 Cal.5th 367, 431 ["We presume jurors

17

understand and follow the instructions they are given"].) Defendant further asserts that "it would be completely unfair to rely on constructive knowledge to find the error harmless in this case" because he suffers from an involuntary medical condition. He cites no authority for this proposition, and, under the facts of this case, we find the assertion to be unconvincing.

## B.    No Error in Instructing on CALCRIM No. 252.

Defendant argues that the trial court erred in instructing the jury on the definition of general intent contained CALCRIM No. 252 because the instruction served to "remove the knowledge element" contained in counts 2 and 3. He asserts CALCRIM No. 252 conflicted with the jury instructions on these counts because it told the jury it could convict him of these offenses if it found that " 'he intentionally [did] a prohibited act; however, it is not required that [he] intend to break the law.' " As above, he asserts the alleged error "went to the key question of whether [he] knew who or what was chasing him when he swung the skateboard."

Pursuant to CALCRIM No. 252, the trial court instructed the jury that, as to counts 2 and 3, "[f]or you to find a person guilty of this/these crimes or to find the allegations true, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation." As to count 1, the court instructed: "For you to find a person guilty of this crime, that person must not only intentionally commit the prohibited act, but must do so with a specific intent/mental state. The act and the specific intent/mental state required are explained in the instruction for that crime."

18

Defendant reasons that CALCRIM No. 252 "told jurors . . . that only count 1 'requires a specific intent or mental state,' " and faults the instruction for failing to specifically include language identifying the knowledge element for the assault and resisting charges. He also asserts the instructional error was not harmless given his testimony that he believed he was being chased by a phantom "feeler," not a police officer. He argues that the instruction "allowed jurors to fully accept [his] defense," yet convict him because he " 'intentionally [did] a prohibited act' " without any intent to break the law.[8]

The error, if any, was not prejudicial. "An instructional error that relieves the prosecution of the burden of proving beyond a reasonable doubt each essential element of the charged offense, or that improperly describes or omits an element of an offense, violates the defendant's rights under both the United States and California Constitutions, and is subject to *Chapman*[9] review. [Citations.] . . . In contrast, 'misdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated' in *Watson.*' " (*People v. Larsen* (2012) 205 Cal.App.4th 810, 829–830).)

As we have already explained, even if defendant did not subjectively realize that Officer Chon was behind him when he swung his skateboard, there was ample evidence that he was aware of facts such that a reasonable

---

[8] In his reply brief, defendant asserts that the recent decision in *People v. Southard* (2021) 62 Cal.App.5th 424, which also involves jury instructions on resisting arrest, mandates reversal here. That case is distinguishable in that it considered CALCRIM No. 250. (*Southard*, at p. 437.) Furthermore, the defendant's awareness of the arresting officers' status as peace officers was not at issue in that case.

[9] *Chapman v. California* (1967) 386 U.S. 18.

person in his position would have known that an officer was chasing him, and the jury was properly instructed on this point. Accordingly, the alleged error was harmless.

## C. No Cumulative Error.

Defendant argues that even if the above claimed errors are harmless when considered individually, together they deprived him of his constitutional rights to due process and a fair trial.

"In examining a claim of cumulative error, the critical question is whether [the] defendant received due process and a fair trial. [Citation.] A predicate to a claim of cumulative error is a finding of error." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) We have determined there are no cognizable claims of instructional error and, therefore, defendant's claim of cumulative error necessarily fails. (*People v. Williams* (2013) 56 Cal.4th 165, 201, disapproved on another ground by *People v. Elizalde* (2015) 61 Cal.4th 523, 538, fn. 9; *People v. Leeds* (2015) 240 Cal.App.4th 822, 837.)

### III. DISPOSITION

The judgment is affirmed.

EAST, J.*

WE CONCUR:

HUMES, P. J.

MARGULIES, J.

A156276
*People v. Ramos-Coreas*

---

* Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.